Douglas L. Honnold
Timothy J. Preso
Jenny K. Harbine
Earthjustice
209 South Willson Ave.
Bozeman, MT  59715
(406) 586-9699
Fax:  (406) 586-9695
dhonnold@earthjustice.org
tpreso@earthjustice.org
jharbine@earthjustice.org

Michael Senatore
Center for Biological Diversity
1601 Connecticut Ave., N.W., Suite 701
Washington, D.C.  20009
(301) 466-0774
Fax:  (202) 588-5209
msenatore@biologicaldiversity.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, FEDERATION OF FLY FISHERS, WESTERN WATERHSEDS PROJECT, GEORGE WUERTHNER, and PAT MUNDAY,<br><br>        Plaintiffs,<br><br>    vs.<br><br>U.S. FISH AND WILDLIFE SERVICE and KEN SALAZAR, Secretary of the Interior,<br><br>        Defendants. | **Case No. CV 07-152- BLG-RFC**<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................2

I.     ARCTIC GRAYLING IN THE UPPER MISSOURI RIVER BASIN..........2

II.    ESA LISTING FRAMEWORK .......................................................................6

III.   HISTORY OF THE UPPER MISSOURI RIVER FLUVIAL
       ARCTIC GRAYLING'S LISTING STATUS ................................................8

IV.   THE 2007 12-MONTH FINDING .................................................................10

ARGUMENT ......................................................................................................13

I.     STANDARD OF REVIEW ...........................................................................13

II.    FWS ARBITRARILY CONCLUDED THAT UPPER MISSOURI
       RIVER FLUVIAL ARCTIC GRAYLING DO NOT SATISFY THE
       "SIGNIFICANCE" REQUIREMENT OF THE DPS POLICY ..................14

       A.    The Upper Missouri River Fluvial Arctic Grayling Is
            Significant Because It Persists In An Unusual Or Unique
            Ecological Setting..............................................................................15

       B.    The Upper Missouri River Fluvial Arctic Grayling Is
            Significant Because Its Loss Would Leave A Significant
            Gap In The Range Of The Taxon.......................................................18

       C.    The Upper Missouri River Fluvial Arctic Grayling Is
            Significant Because It Differs Markedly From Other
            Populations In Its Genetic Characteristics.........................................22

III.   FWS ARBITRARILY FAILED TO CONSIDER WHETHER FLUVIAL
       AND ADFLUVIAL POPULATIONS OF UPPER MISSOURI
       RIVER ARCTIC GRAYLING CONSTITUTE A DPS................................27

CONCLUSION ...................................................................................................28

# TABLE OF AUTHORITIES

## FEDERAL CASES

Defenders of Wildlife v. Hall,
    565 F. Supp. 2d 1160 (D. Mont. 2008) ........................................................17

Defenders of Wildlife v.  U.S. Dep't of the Interior,
    354 F. Supp. 2d 1156 (D. Or. 2005)................................................................7

Greater Boston Television Corp. v. FCC,
    444 F.2d 841 (D.C. Cir. 1970)......................................................................18

Lands Council v. McNair,
    537 F.3d 981 (9th Cir. 2008) ........................................................................13

Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto Ins. Co.,
    463 U.S. 29 (1983).................................................................................. *passim*

Nat'l Ass'n of Homebuilders v. Norton,
    340 F.3d 835 (9th Cir. 2003) ............................................................13, 19, 20

Northwest Ecosystem Alliance v. U.S. Fish and Wildlife Serv.,
    475 F.3d 1136 (9th Cir. 2007).....................................................17, 19, 20, 21

Northwest Env'l Def. Ctr. v. Bonneville Power Admin.,
    477 F.3d 668 (9th Cir. 2007) ..................................................................18, 24

Pac. Coast Fed'n Of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.,
    265 F.3d 1028 (9th Cir. 2001) ................................................................26, 28

W. States Petroleum Ass'n v. EPA,
    87 F.3d 280 (9th Cir. 1996) ..........................................................................18

W. Watersheds Project v. Fish and Wildlife Serv.,
    535 F. Supp. 2d 1173 (D. Id. 2007)..............................................................17

## STATUTES AND LEGISLATIVE MATERIALS

Administrative Procedure Act,
  5 U.S.C. § 706(2)(A) ........................................................................13

Endangered Species Act,
  16 U.S.C. § 1531 et seq .......................................................................1
       § 1531(b)................................................................................6, 15
       § 1532(16)..................................................................................6
       § 1533(a)(1) ..........................................................................6, 28
       § 1540(g)..................................................................................13

S. Rep. No. 96-151 (1979) .......................................................................7

## FEDERAL REGISTER DOCUMENTS

47 Fed. Reg. 58,454 (Dec. 30, 1982) ..........................................................8

59 Fed. Reg. 37,738 (July 27, 1994)................................................... passim

61 Fed. Reg. 4,722 (Feb. 7, 1996) ..................................................... passim

66 Fed. Reg. 54,807(Oct. 30, 2001)...........................................................9

67 Fed. Reg. 40,657(June 13, 2002) .........................................................9

69 Fed. Reg. 24,876(May 4, 2004) ......................................................9, 16

72 Fed. Reg. 20,305 (Apr. 24, 2007) ................................................. passim

## INTRODUCTION

This action challenges the U.S. Fish and Wildlife Service's ("FWS")
determination that the upper Missouri River fluvial Arctic grayling does not
qualify as a distinct population segment ("DPS") suitable for protection under the
Endangered Species Act ("ESA"), 16 U.S.C. § 1531 <u>et</u> <u>seq.</u>  Since at least 1994,
FWS has recognized that significant threats—including critically low abundance
and poor habitat conditions—imperil the fluvial Arctic grayling population in
Montana and warrant listing the population as threatened or endangered.  The
threats to the population's survival have grown even more acute since 1994.  FWS
has characterized these threats as "high in magnitude and imminent."  AR 1679.[1]
Fluvial Arctic grayling are likely to suffer due to further habitat degradation in the
future, as low stream flows are exacerbated by global warming.  Nonetheless, in
2007, FWS removed the upper Missouri River fluvial Arctic grayling from the list
of candidate species for ESA listing.  <u>See</u> Revised 12-Month Finding for Upper
Missouri River Distinct Population Segment of Fluvial Arctic Grayling, 72 Fed.
Reg. 20,305 (Apr. 24, 2007) ("12-month finding").

FWS accomplished this unjustified result by reversing its multiple prior
determinations that the population constitutes a listable entity under the ESA,

---

[1] References to FWS's administrative record are indicated by "AR" followed by
the Bates-stamped page number.  References to the separately indexed
supplemental administrative record are indicated by "SAR" followed by the page
number.

notwithstanding the absence of any new evidence to justify such a departure.  By

concluding that the upper Missouri River fluvial Arctic grayling is not listable,

FWS avoided the critical threats analysis that would have required FWS to

confront the imperative to identify the population as threatened or endangered and

to implement a conservation program to ensure its survival.  In so doing, FWS

violated the ESA.

## BACKGROUND

## V.    ARCTIC GRAYLING IN THE UPPER MISSOURI RIVER BASIN

The Arctic grayling, a member of the family Salmonidae, is a native fish of

Montana characterized by a sail-like dorsal fin, which is vividly colored with

orange to bright green spots.  72 Fed. Reg. at 20,305.  "Arctic grayling have

elongate, laterally compressed bodies with deeply forked tails," and range in color

from iridescent blue and lavender to dark blue.  Id.  Arctic grayling exhibit both

fluvial and adfluvial life histories.  Fluvial (river-dwelling) Arctic grayling occupy

cool-water rivers and streams year-round, and typically migrate between spawning,

feeding, and wintering habitats.  Id. at 20,308; AR 1631.  Adfluvial (lake-dwelling)

Arctic grayling spend most of the year in lakes, migrating to inlet or outlet streams

only to spawn.  72 Fed. Reg. at 20,308.

Only two populations of Arctic grayling have been recorded in North

America outside of Canada and Alaska.  Id. at 20,306.  Arctic grayling once

inhabited rivers and streams in northern Michigan, but were extirpated in the 1930s.  Id.  The sole remaining population in the lower-48 United States persists in the upper Missouri River basin in Montana.  Id.  There, they have been isolated from northern populations in Canada and Alaska for approximately 70,000 years and persist in the southernmost extent of the species' range.  Id. at 20,308.  Genetic data demonstrate significant divergence between Montana's Arctic grayling and northern populations.  Id.

Fluvial Arctic grayling—the dominant life history in the upper Missouri River basin—historically inhabited the Sun, Smith, Gallatin, Madison, Jefferson, Beaverhead, and Big Hole Rivers and several creeks.  Id. at 20,306-07; AR 1632. Adfluvial populations occupied numerous lakes, including Red Rock and Elk Lakes.  72 Fed. Reg. at 20,306-07.  The only remaining fluvial Arctic grayling population in the upper Missouri River basin resides in the Big Hole River.  Id. at 20,308.  Adfluvial characteristics currently exhibited by Arctic grayling in the Madison River and Ennis Reservoir likely reflect recent divergence from a historical fluvial form due to construction of the Ennis Dam.  Id.  Thus, prior to 2007, FWS consistently categorized Madison River/Ennis Reservoir Arctic grayling as belonging within the fluvial Arctic grayling population.  See, e.g., Finding on a Petition to List the Fluvial Population of the Arctic Grayling as Endangered, 59 Fed. Reg. 37,738, 37,739 (July 27, 1994); AR 1638-39, 1668.

3

Fluvial Arctic grayling are estimated to occupy 5 percent or less of their historical range within the upper Missouri River basin.  AR 1666.  The scarcity of fluvial Arctic grayling and poor habitat conditions have made population estimates difficult.  However, the data indicate "a declining population (low abundance) characterized by inconsistent recruitment (skewed age structure)."  AR 1668.  Data from 2002, the most recent available at the time of the 2007 12-month finding, indicate that Big Hole population "abundance was presumed to fall below the minimum density threshold [of 30 grayling per river mile] because too few grayling were captured to generate a mark-recapture abundance estimate" (i.e., too few fish were captured and marked to conduct recapture sampling).  AR 1667-68.  In 2005, FWS reported that "Arctic grayling resident in the Ennis Reservoir section of the Madison River (putatively part of the fluvial DPS) are present at very low abundance and at risk of extirpation."  AR 1668-69.  Efforts to reestablish fluvial Arctic grayling in other rivers and streams within their historical range have been unsuccessful.  See AR 1670-71; 72 Fed. Reg. at 20,310.  "Possible reasons for the failure of these introductions are the persisting drought, the presence of nonnative trout, and the limited number of grayling to be stocked."  AR 1671.

FWS has concluded that threats to fluvial Arctic grayling warrant its listing as endangered or threatened under the Endangered Species Act.  See 59 Fed. Reg. at 37,738; AR 1630-63 (2004 Species Assessment); AR 1664-87 (2005 Species

Assessment).  Agricultural activities have degraded Arctic grayling habitat by

dewatering streams, introducing chemicals to the river, removing riparian

vegetation, and widening channels. AR 1674-75.  Arctic grayling are also

susceptible to predation and/or competition from non-native trout.  AR 1676.

Perhaps the most pervasive threat to Arctic grayling is low stream flows.

See AR 1674, 1677.  Persistent drought and agricultural diversions have degraded

grayling spawning habitat, reduced connectivity between necessary spawning,

rearing, and refuge habitats, and resulted in summer water temperatures that "have

exceeded the upper incipient lethal temperature … for Arctic grayling."  AR 1674-

75.  Global warming is predicted to exacerbate these conditions, resulting in

increasing habitat loss and fragmentation and greater "thermal constraints" on Big

Hole River grayling if other habitat conditions do not improve.  AR 1677.  State

and federal agencies have entered into a Candidate Conservation Agreement with

Assurances ("CCAA") which has the as-yet unrealized goal of improving habitat

for fluvial Arctic grayling in the Big Hole River.  See AR 1678.

As FWS summarized in 2005:

> Overall, threats to fluvial Arctic grayling are ongoing and expected to
> remain so in the absence of active measures to restore aquatic and
> riparian habitats, improve instream flows, and reduce habitat
> fragmentation in the Big Hole River.  These efforts are planned (e.g.,
> CCAA), but have not yet been fully implemented so the threats
> remain imminent.

AR 1681.

## VI.   ESA LISTING FRAMEWORK

Congress enacted the ESA "to provide a program for the conservation of …

endangered species and threatened species" and "to provide a means whereby the

ecosystems upon which endangered species and threatened species depend may be

conserved."  16 U.S.C. § 1531(b).  To apply the substantive protections provided

by the ESA, FWS must first list a species as endangered or threatened.  See 16

U.S.C. § 1533(a)(1).

The ESA defines species to include "any subspecies of fish or wildlife or

plants, and any distinct population segment of any species of vertebrate fish or

wildlife which interbreeds when mature."  Id. § 1532(16).  Because "distinct

population segment" is not defined in the ESA, FWS developed the Policy

Regarding the Recognition of Distinct Vertebrate Population Segments ("DPS

Policy").  See 61 Fed. Reg. 4,722 (Feb. 7, 1996).  Pursuant to this policy, FWS

considers three factors in evaluating whether a population is a DPS: 1) whether a

population is "discrete;" 2) "[t]he significance of the population segment to the

species to which it belongs;" and 3) "[t]he population segment's conservation

status in relation to the Act's standards for listing."  61 Fed. Reg. at 4,725.

A population segment will be considered discrete if it is markedly "separated

from other populations because of physical, physiological, ecological, or

behavioral factors, including genetic discontinuity," or is "delimited by

international boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of 4(a)(1)(D) of the Act."  Id.

In determining a population's significance, FWS's evaluation "may include, but is not limited to" the following factors:

> 1) Persistence of the discrete population segment in an ecological setting unusual or unique for the taxon;
>
> 2) Evidence that loss of the discrete population segment would result in a significant gap in the range of the taxon;
>
> 3) Evidence that the discrete population segment represents the only surviving natural occurrence of the taxon that may be more abundant elsewhere as an introduced population outside its historic range; or
>
> 4) Evidence that the discrete population segment differs markedly from other populations of the taxon in its genetic characteristics.

Id.

In authorizing the listing of DPSs, Congress recognized "that there may be instances in which FWS should provide for different levels of protection for populations of the same species.  For instance, the U.S. population of an animal should not necessarily be permitted to become extinct simply because the animal is more abundant elsewhere in the world."  S. Rep. No. 96-151, at 11 (1979).  Thus, the DPS Policy allows FWS to list populations of a species "even though the conservation status of the species may differ elsewhere."  Defenders of Wildlife v. U.S. Dep't of the Interior, 354 F. Supp. 2d. 1156, 1169 (D. Or. 2005).  FWS

emphasized that interpretations of the DPS policy should be aimed at carrying out the conservation purposes of the ESA.  See 61 Fed. Reg. at 4,722.

## VII.   HISTORY OF THE UPPER MISSOURI RIVER FLUVIAL ARCTIC GRAYLING'S LISTING STATUS

For over two decades, FWS recognized that the unique and isolated fluvial Arctic grayling population in the upper Missouri River basin warrants ESA protection as a DPS.  In 1982, FWS used the internal initiative process to place the Montana Arctic grayling on the candidate species list.  See 47 Fed. Reg. 58,454 (Dec. 30, 1982).  FWS classified Montana Arctic grayling as a "Category 2" species, meaning that listing was possibly appropriate, but that data were not then available to biologically support a proposed rule.  See id.; 72 Fed. Reg. at 20,310.

On October 2, 1991, George Wuerthner and the Biodiversity Legal Foundation (now, the Center for Biological Diversity) submitted a petition to list the "fluvial Arctic grayling" throughout its historic range in the conterminous United States.  See 59 Fed. Reg. at 37,739.  Nearly three years later, on July 25, 1994, FWS issued a 12-month finding on the petition to list.  See id. at 37,738. The 1994 12-month finding identified Montana fluvial Arctic grayling—including populations in the Big Hole River and the Madison River/Ennis Reservoir—as a DPS based on its behavioral distinctiveness relative to adfluvial grayling and its geographical isolation.  See id. at 37,739.  The finding recognized threats to the grayling, including reduction in historical range, dewatering of streams,

competition or predation by nonnative fish, and habitat degradation.  Id. at 37,739-

40.  Due to these threats, FWS concluded that listing of the Montana fluvial Arctic

grayling DPS was "warranted," but nonetheless "precluded by other higher priority

listing actions."  Id. at 37,741.  FWS assigned the DPS "a listing priority of 9

because the magnitude of threats have been moderated as a result of ongoing

cooperative conservation actions."  Id.  FWS maintained this status for the

population through "Candidate Notices of Review" until 2004.  See, e.g. 66 Fed.

Reg. 54,807, 54,819 (Oct. 30, 2001); 67 Fed. Reg. 40,657, 40,669 (June 13, 2002).

In 2004, FWS elevated the fluvial Arctic grayling's listing priority to 3—the

highest priority available for a DPS—"because the abundance of the remnant

population in the Big Hole River declined substantially and the reestablishment

efforts [had] not yet produced self-sustaining populations elsewhere in the upper

Missouri River."  69 Fed. Reg. 24,876, 24,881 (May 4, 2004).  FWS's 2004

Species Assessment provided a detailed analysis of the upper Missouri River

fluvial Arctic grayling pursuant to the criteria in the 1996 DPS Policy.  See AR

1637-44.  As FWS stated:

> We find the fluvial Arctic grayling of the upper Missouri River basin
> to be discrete and significant as required under the policy regarding
> the recognition of Distinct Vertebrate Population Segments. We have
> determined that this DPS is discrete based on geographic, ecological,
> and behavioral differences relative to other members of its taxon; and
> is significant primarily because of its presence in a unique ecological
> setting and also its genetic distinctiveness.

AR 1643-44.  FWS affirmed its DPS conclusion in its November 2, 2005 Species

Assessment.  See AR 1671-74.  FWS also affirmed the fluvial Arctic grayling's

high listing priority "because the threat to the confirmed remaining population in

the Big Hole River remains high in magnitude and imminent."  AR 1679.

On May 31, 2003, the Center for Biological Diversity, Western Watersheds

Project and George Wuerthner filed a complaint in United States District Court in

Washington, D.C., challenging FWS's ongoing "warranted but precluded"

determinations.  See Ctr. for Biological Diversity v. FWS, CV 1:03-01110 (JDB).

The litigation was settled in August 2005, pursuant to which FWS agreed that on

or before April 16, 2007, the agency would render a final decision as to whether

the Montana fluvial Arctic grayling is an endangered or threatened species.  See

AR 650.

## VIII.  THE 2007 12-MONTH FINDING

The administrative record reveals that FWS's response to the 2005

settlement yielded a constantly changing rationale to justify a final decision not to

list fluvial Arctic grayling.  FWS field office biologists began drafting a 12-month

finding that would list a combined fluvial and adfluvial upper Missouri River DPS.

SAR 161-62, 179, 205-21, 336.  However, as early as February 2006, field

biologist Doug Peterson was told by the FWS regional office to "[r]emember …

that a DPS determination is ultimately a policy issue, and not just a science issue."

AR 452.  On June 15, 2006, Montana field staff were informed that "the decision ha[d] been made to not list—it [the combined fluvial/adfluvial population] is not discrete, it is not significant and the threats do not warrant listing," and that the decision had been made at the "highest level of management."  AR 379.  Field biologist Doug Peterson expressed his disagreement with the new direction, stating that "[h]opefully the budget projections will include the cost of future litigation and the near certainty that we'll lose in court."  AR 380.

One month later, on July 19, 2006, FWS changed its strategy for arriving at a negative 12-month finding—this time by asserting that the fluvial Arctic grayling does not satisfy the "discreteness" or "significance" criteria of the DPS Policy. See SAR 133-35.  Tasked with drafting the new finding, field biologist Doug Peterson noted that "[t]he finding's conclusion is clearly based on an interpretation of the DPS policy (as directed by the [Regional Director]) that differs from the conclusion that would be made from using a 'weight of scientific evidence' approach."  SAR 111.  In his November 22, 2006 cover memorandum transmitting the proposed 12-month finding to the regional office, Montana field supervisor Mark Wilson stated that "the conclusion is keeping with the DPS policy call intent of the Regional Director and his staff, conveyed to us in multiple conference calls and personal discussions that have occurred over the course of the last six months

or so … Biologically, the finding's conclusion should probably be considered tentative."  SAR 92.

The administrative record does not reflect any further involvement from Montana field office biologists in developing the final 12-month finding.  On March 23, 2007—just over a month before the final 12-month finding was published in the Federal Register—the Regional Office prepared a new draft 12-month finding with yet another rationale.  See AR 70-102.  In the new draft, fluvial Arctic grayling were deemed "discrete," but not "significant" under the DPS policy.  See AR 98-99.

FWS published the final 12-month finding on April 24, 2007.  See 72 Fed. Reg. 20,305.  FWS concluded that upper Missouri River fluvial Arctic grayling satisfied the "discreteness" criterion of the DPS Policy due to the population's geographic and reproductive isolation and as a result of "behavioral features."  Id. at 20,311-12.  However, FWS determined that the population was not "significant" under the DPS Policy.  See id. at 20,312-13.  In so concluding, FWS reversed its multiple previous findings that upper Missouri River fluvial Arctic grayling persist in a unique or unusual ecological setting, that loss of the population would result in a significant gap in the species' range, and that upper Missouri River fluvial Arctic grayling differ markedly from other populations in their genetic characteristics. See id.; see also 61 Fed. Reg. at 4,725 (DPS Policy).  Because FWS concluded that

12

fluvial Arctic grayling of the upper Missouri River do not qualify as a DPS under the Act, the 12-month finding did not address the substantial threats to the population's survival.

## ARGUMENT

## I.      STANDARD OF REVIEW

Plaintiffs bring this case under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), which provides the standard of review.  See Nat'l Ass'n of Homebuilders v. Norton, 340 F.3d 835, 840-41 (9th Cir. 2003).  Under the APA, the court will set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Id.  Although this standard requires that deference be given to "an agency's determination in an area involving a 'high level of technical expertise,'" Lands Council v. McNair, 537 F.3d 981, 993 (9th Cir. 2008) (en banc) (citation omitted), administrative action nonetheless must be vacated where the agency:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983).

## II.   FWS ARBITRARILY CONCLUDED THAT UPPER MISSOURI RIVER FLUVIAL ARCTIC GRAYLING DO NOT SATISFY THE "SIGNIFICANCE" REQUIREMENT OF THE DPS POLICY

FWS's 2007 decision not to list the upper Missouri River fluvial Arctic grayling as threatened or endangered arbitrarily reversed the agency's consistent, prior findings that listing of the DPS was warranted.  FWS failed to justify the reversals in the 12-month finding, and indeed, could not have done so based upon the evidence before the agency.  Contrary to FWS's most recent conclusion, the upper Missouri River fluvial Arctic grayling qualifies as a DPS because it is "discrete" and "significant."  FWS's 2007 determination that the petitioned entity is not "significant" wholly reverses the agency's prior, well-supported conclusions that:  (1) the upper Missouri River fluvial Arctic grayling persists in a unique ecological setting; (2) loss of the population would leave a significant gap in the range of the species; and (3) the population differs markedly from other Arctic grayling populations with respect to genetics.  In each category, FWS's reversal is unsupported by the record, including the agency's own science.  A positive finding under any one of the "significance" factors would require the agency to classify the population as a DPS.

FWS's error goes to the heart of the ESA listing determination for the grayling.  Upon determining that the upper Missouri River fluvial Arctic grayling is a DPS, FWS would have to confront the compelling need to list the DPS as

threatened or endangered under the ESA due to the overwhelming threats to the

population's survival.  By concluding that the upper Missouri River fluvial Arctic

grayling is not a "listable entity," however, FWS avoided such a listing

determination, thereby shirking its ESA duties to "provide a means whereby the

ecosystems upon which endangered species and threatened species depend may be

conserved [and] to provide a program for the conservation of such" species.  16

U.S.C. § 1531(b).  For the reasons set forth below, FWS's determination in the

2007 12-month finding that the upper Missouri River fluvial Arctic grayling is not

a DPS was arbitrary, capricious, and contrary to the ESA.

> **A.    The Upper Missouri River Fluvial Arctic Grayling Is Significant Because It Persists In An Unusual Or Unique Ecological Setting**

FWS's 2007 conclusion that upper Missouri River fluvial Arctic grayling do

not persist in an unusual or unique ecological setting represents an unexplained and

arbitrary reversal of the agency's prior, opposite conclusions, which were properly

based on the evidence before the agency.  In FWS's 2004 and 2005 species

assessments, the agency concluded "that the fluvial Arctic grayling of the upper

Missouri River persist in an ecological setting unusual or unique for the taxon as

they represent the only natural example of the taxon inhabiting an Atlantic Ocean

drainage."  72 Fed. Reg. at 20,312; see also AR 1642, 1673 (2004 and 2005

species assessments).  All other Arctic grayling populations occupy Arctic

drainages, draining into the Hudson Bay, Arctic Ocean, or North Pacific Ocean. AR 1642, 1673.

In the 2007 12-month finding, FWS reversed course, stating that the agency's prior conclusions did not take into account adfluvial populations that also persist in the Missouri River drainage.  72 Fed. Reg. at 20,312.  FWS's rationale does not justify the agency's departure from its earlier conclusions.  FWS knew of the adfluvial population of Arctic grayling in the Missouri River drainage at the time of its 2004 and 2005 species assessments, but did not deem it significant in reaching the agency's 2004 and 2005 conclusions.  See AR 1642, 1673.

In similar fashion, the 2007 12-month finding concludes that upper Missouri River fluvial Arctic grayling do not occupy a unique habitat type because fluvial populations also exist in Canada and Alaska.  72 Fed. Reg. at 20,312.  FWS assumed that fluvial populations in both regions "depend on large streams, deep pools of small streams, or spring-fed reaches that are not completely frozen in winter for over winter survival."  Id.  Again, however, FWS was fully aware that fluvial Arctic grayling populations exist in Canada and Alaska when it determined in 1994, 2004 and 2005 that upper Missouri River fluvial Arctic grayling are significant and thus suitable for listing as a DPS.  See 59 Fed. Reg. at 37,739; 69 Fed. Reg. at 24,881; see also AR 1642-43, 1673.

16

Further, FWS's 2004 candidate assessment noted that the Montana fluvial Arctic grayling is the only fluvial population that occupies the "steppe-coniferous forest-tundra province of the dry ecoregion domain." AR 1642. FWS thus determined in 2004 that Montana fluvial Arctic grayling satisfy the "significance" requirement of the DPS analysis based on the "specific suite of geoclimatic and vegetation characteristics" of its habitat. Id. The 2007 12-month finding does not mention this earlier conclusion and does not provide any new information that could justify the agency's departure from this finding.

FWS offered no explanation why the foregoing information justified a "significant" finding in 1994, 2004, and 2005, but not in 2007. "While an agency may reach different conclusions than those signaled in [an earlier] finding, it must explain why." W. Watersheds Project v. Fish and Wildlife Serv., 535 F. Supp. 2d 1173, 1187 (D. Id. 2007) (citing Northwest Ecosystem Alliance v. U.S. Fish and Wildlife Serv., 475 F. 3d 1136 (9th Cir. 2007)); see also Defenders of Wildlife v. Hall, 565 F. Supp. 2d. 1160, 1171 (D. Mont. 2008) (rejecting FWS's explanation for departing from wolf recovery criteria because FWS "provide[d] no new evidence or research that did not exist when the recovery criteria were established"). Here, FWS offered no rationale to explain why the upper Missouri River fluvial arctic grayling do not occupy a unique ecological setting based upon all of these ecological features. Montana fluvial Arctic grayling occupy a unique

ecological setting in relation to all other Arctic grayling populations because they persist within a particularized habitat type <u>and</u> within an Atlantic Ocean drainage.

In sum, FWS's 2007 conclusion that upper Missouri River fluvial Arctic grayling do not persist in a unique or unusual ecological setting contradicts FWS's prior determinations and is not supported by the record.  This departure is unaccompanied by any explanation.  "[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute."  <u>Northwest Env'l Def. Ctr. v. Bonneville Power Admin.</u>, 477 F.3d 668, 687-88 (9th Cir. 2007) (quoting <u>Greater Boston Television Corp. v. FCC</u>, 444 F.2d 841, 852 (D.C. Cir. 1970)); <u>see also</u> <u>W. States Petroleum Ass'n v. EPA</u>, 87 F.3d 280, 284 (9th Cir. 1996) (an agency "must clearly set forth the ground for its departure from prior norms so that [the court] may understand the basis of the [agency's] action and judge the consistency of that action with the [agency's] mandate").  FWS failed to provide such a reasoned analysis here and thereby violated the ESA.

**B.     The Upper Missouri River Fluvial Arctic Grayling Is Significant Because Its Loss Would Leave A Significant Gap In The Range Of The Taxon**

FWS also arbitrarily departed from its prior conclusions that the upper

Missouri fluvial Arctic grayling qualifies for DPS listing because loss of the population "would result in a significant gap in the range of the taxon." 61 Fed. Reg. at 4,725. The Ninth Circuit has noted that "[e]ven the loss of a peripheral population, however small, would create an empty geographic space in the range of the taxon … To satisfy the second significance factor, however, the gap must be significant." Nat'l Ass'n of Homebuilders, 340 F.3d at 846. "For purposes of the 'gap in the range' analysis, the term 'significant' has 'its commonly understood meaning,' which is 'important.'" Northwest Ecosystem Alliance, 475 F.3d at 1146 (quoting Nat'l Ass'n of Homebuilders, 340 F.3d at 846).

In light of this clear Ninth Circuit guidance, FWS's 2007 12-month finding concluded that loss of fluvial Arctic grayling from the upper Missouri River basin would be insignificant, reversing earlier findings that the loss of the population would be significant because it represents the only fluvial population in the lower-48 United States and the southernmost extent of the species' range. See AR 1642, 1673. FWS cites the Ninth Circuit's 2003 decision in National Association of Homebuilders v. Norton as an explanation for the reversal. See 72 Fed. Reg. at 20,312. The Ninth Circuit in that case held that FWS must evaluate whether a gap in the species' range would be significant to the taxon as a whole, rather than whether the gap would be significant to the United States. See Nat'l Ass'n of Homebuilders, 340 F.3d at 849-50. Even if this holding justifies FWS's rejection

of its prior rationale, however, the Ninth Circuit also recognized that the loss of a population may nevertheless result in a significant gap in the range based upon other factors.  See id. at 846-50.  "The plain language of the second significance factor does not limit how a gap could be important."  Id. at 846.

FWS's myopic focus on the geographic extent of the species' range was arbitrary.  "[T]he 'significance' inquiry under the DPS Policy is not limited to geographic factors.  On its face, the DPS Policy considers ecological, historical, and genetic factors in addition to geography."  Northwest Ecosystem Alliance, 475 F.3d at 1148 (upholding FWS's "significant gap" analysis for the Washington population of the western gray squirrel).  FWS's 2007 determination failed to consider these other factors that are essential to the "significance" analysis, including the genetic and historical importance of the population's range.  See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (agency action is arbitrary where agency "failed to consider an important aspect of the problem").

FWS failed to consider whether loss of Montana's fluvial Arctic grayling population would reduce the genetic variability of the species, despite acknowledging the population's genetic significance.  As FWS conceded, Arctic grayling within the Missouri River drainage are genetically distinct from Canada and Alaska Arctic grayling populations.  72 Fed. Reg. at 20,311.  Further, among Arctic grayling in the upper Missouri River basin, the fluvial population exhibits

heritable differences in juvenile swimming behavior relative to native adfluvial populations.  See id. at 20,310.  These differences appear to have a genetic basis, which has led FWS to hypothesize a "lack of ecological exchangeability" between the populations.  See id.  One study cited extensively in the 2007 12-month finding concluded that evidence of this genetically based behavior "reinforce[s] the importance of conserving the small, remnant population of Arctic grayling in the Big Hole River."  AR 1037 (Kaya and Jeanes 1995).  Loss of fluvial Arctic grayling in the upper Missouri River basin would thus diminish the species' genetic variability, but FWS ignored this issue.

Likewise, FWS failed to consider whether loss of the fluvial Arctic grayling in Montana may result in a significant gap in the species' range due to "historical" factors.  Northwest Ecosystem Alliance, 475 F.3d at 1148.  Arctic grayling historically occupied only two areas in the lower-48 United States: the Great Lakes Region of northern Michigan and the upper Missouri River basin upstream of Great Falls, Montana.  72 Fed. Reg. at 20,306.  Michigan's grayling population was extirpated by the 1930s, leaving only the Montana population in the conterminous United States.  Id.  "Genetic data indicate Arctic grayling native to the Missouri River system were most likely isolated geographically from Hudson Bay and Arctic Ocean drainages by the onset of Wisconsin glaciation approximately 70,000 years ago," resulting in significant genetic divergence

between Missouri River Arctic grayling and other populations.  Id. at 20,308.

Fluvial Arctic grayling are the predominant life history within the upper Missouri

River basin.  See 59 Fed. Reg. at 37,739.  The fluvial Arctic grayling has

disappeared from about 95 percent of its historic upper Missouri range and now

occurs only in the Big Hole River, along with historically fluvial remnant

populations in the Madison River.  See 72 Fed. Reg. at 20,307.   Despite FWS's

acknowledgement of these facts, FWS in its 12-month finding never considered

whether loss of this last remaining fluvial Arctic grayling population that diverged

from northern populations 70,000 years ago would be historically significant.  See

AR 602 (FWS biologist's conclusion that loss of the dominant life history in the

upper Missouri likely would be significant).

Because FWS's "significant gap in the range" analysis failed to consider

important genetic and historical factors, FWS's determination that the population

does not constitute a DPS on this basis is arbitrary and capricious.  See Motor

Vehicle Mfrs. Ass'n, 463 U.S. at 43.

### C.   The Upper Missouri River Fluvial Arctic Grayling Is Significant Because It Differs Markedly From Other Populations In Its Genetic Characteristics

FWS likewise acted arbitrarily in assessing whether Montana fluvial Arctic

grayling are also significant under FWS's DPS policy because the population

"differs markedly from other populations of the species in its genetic

characteristics."  61 Fed. Reg. at 4,725.  Until FWS issued its 2007 12-month

finding, the agency had consistently included the Madison River/Ennis Reservoir

grayling population as a part of the fluvial Arctic grayling DPS.  See, e.g., 59 Fed.

Reg. at 37,739 (1994 12-month finding: "the Arctic grayling of Ennis

Reservoir/Madison River will be considered a remnant of the upper Missouri River

fluvial Arctic grayling population"); AR 1639 (2004 Species Assessment:  "the

Madison River/Ennis Reservoir Arctic grayling will be included in the proposed

fluvial DPS"); AR 1668 (2005 Species Assessment: "Arctic grayling resident in

the Ennis Reservoir section of the Madison River (putatively part of the fluvial

DPS) …").  Using this definition, FWS concluded in its 2004 and 2005 candidate

assessments that the fluvial DPS differs markedly from other native adfluvial

populations (e.g. Red Rock Lakes, Elk Lake) with respect to its molecular genetic

traits.  See AR 1643.

Nevertheless, in 2007, the agency redefined the fluvial Arctic grayling DPS

to exclude the Madison River/Ennis Reservoir population, and then used the

genetic similarity between Arctic grayling in the Madison River/Ennis Reservoir

population and the Big Hole River population as a basis for finding that the fluvial

Arctic grayling (i.e., the Big Hole River population) is not significant.  See 72 Fed.

Reg. at 20,312-13.  FWS provided no explanation for, nor even any

acknowledgment of, its about-face decision to redefine the fluvial Arctic grayling

DPS.  Because FWS's 1994 12-month finding concluded that the fluvial Arctic grayling DPS included the Madison River/Ennis Reservoir Arctic grayling, 59 Fed. Reg. at 37,739, FWS's 2007 "revised 12-month finding" on the species should have used this same definition or, at a minimum, justified the departure.  72 Fed. Reg. at 20,305; see Northwest Env'l Def. Ctr., 477 F.3d at 687-88.

FWS's long-standing (prior to 2007) treatment of Madison River/Ennis Reservoir Arctic grayling as part of the fluvial Arctic grayling DPS had a sound basis "because the best available data indicate they are a remnant of that larger fluvial population segment of the upper Missouri River which includes the Big Hole River grayling as its core population."  AR 1639; see also AR 475.  Habitat modifications likely fragmented the historic fluvial population, and the Madison River population now has "a more adfluvial life history."  AR 475.  Until the 2007 12-month finding, FWS's proposed fluvial Arctic grayling DPS consistently referred to the historical fluvial population, rather than one defined by current habitat constraints.  See, e.g., 59 Fed. Reg. at 37,739; AR 1639, 1668.

In the challenged finding, FWS acknowledges that the Big Hole River and Madison River/Ennis Reservoir populations form a genetically distinct group from the Red Rock and Elk Lakes populations.  See 72 Fed. Reg. at 20,311.  Thus, had FWS defined the upper Missouri River fluvial Arctic grayling population to include the Madison River/Ennis Reservoir population, consistent with the

agency's previous findings, the genetic distinctiveness of that population would have supported a conclusion that it "differs markedly from other populations of the species in its genetic characteristics," and thus qualifies as a DPS.  61 Fed. Reg. at 4,725.  By separating the two populations based on current life histories, however, FWS used their genetic similarity as an argument against a finding of "significance" on the basis of genetics.  See 72 Fed. Reg. at 20,309 ("the existing genetic data do not strongly support the hypothesis that the fluvial form of Arctic grayling in the upper Missouri River represents a unique genetic lineage, because it is genetically similar to adfluvial populations in Miner Lake and in the Madison River").

FWS's conclusion relied primarily on two scientific authorities:  Leary 2005 and Campton 2006.  See 72 Fed. Reg. at 20,309, 20,313.  However, both of these authorities support listing a fluvial Arctic grayling DPS that includes the Big Hole River and Madison River/Ennis Reservoir populations.  Leary 2005 noted that molecular genetic data demonstrate genetic similarities between fluvial Arctic grayling in the Big Hole River and the adfluvial Madison River/Ennis Reservoir population, and significant divergence between other native adfluvial populations.  See AR 594.  In a review of Leary, Campton, FWS's staff geneticist, noted that the "historically widespread fluvial population" that is now represented by Arctic grayling populations in the Big Hole River and Madison River/Ennis Reservoir is

"reproductively distinct" from adfluvial populations inhabiting Red Rock and Elk Lakes.  AR 478.  As FWS summarized the scientists' findings, "the available genetic data are consistent with the hypothesis of two genetic groups of Arctic grayling (the Big Hole—Madison River and Red Rock Lakes genetic groups) within the upper Missouri River."  72 Fed. Reg. at 20,311.

This determination that upper Missouri River fluvial Arctic grayling—defined to include both the Big Hole River and Madison River/Ennis Reservoir populations—are genetically distinct from native adfluvial populations in Red Rock and Elk lakes supports the conclusion that the fluvial Arctic grayling "differs markedly from other populations of the species in its genetic characteristics."  61 Fed. Reg. at 4,725.  FWS cannot escape this conclusion by arbitrarily redefining the DPS.  Pac. Coast Fed'n Of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv., 265 F.3d 1028, 1034 (9th Cir. 2001) (agency must "articulate[] a rational connection between the facts found and the choices made").

In sum, with respect to three separate "significance" factors identified in FWS's DPS policy, FWS reversed its well-supported, prior findings that the upper Missouri River fluvial Arctic grayling are "significant."  61 Fed. Reg. at 4,725.  Because FWS failed to provide sufficient justification for its departures and ignored the contrary record evidence, FWS's conclusion that the upper Missouri River fluvial Arctic grayling population does not satisfy the DPS "significance"

criterion is arbitrary, capricious, and contrary to the ESA and FWS's DPS policy.

**III.   FWS ARBITRARILY FAILED TO CONSIDER WHETHER FLUVIAL AND ADFLUVIAL POPULATIONS OF UPPER MISSOURI RIVER ARCTIC GRAYLING CONSTITUTE A DPS**

Even if FWS were correct—which it was not—that the fluvial population of upper Missouri River Arctic grayling is not itself a DPS, FWS should have consider whether the fluvial and adfluvial populations together comprise a DPS. While this approach was repeatedly recommended by FWS staff scientists, in the final 12-month finding, FWS arbitrarily failed to even address the suggestion.  See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (agency action is arbitrary and capricious if it "failed to consider an important aspect of the problem")

Both Leary 2005 and Campton 2006—relied upon heavily by FWS in the 2007 12-month finding—concluded that "Arctic grayling in Montana clearly meet the significance criterion of the DPS policy relative to populations in Canada and Alaska.  AR 479; see also AR 593 ("Because of their disjunct distribution and high amounts of detectable genetic divergence, upper Missouri River Arctic grayling certainly would warrant being considered a distinct population segment.").  Indeed, the administrative record indicates that FWS was pursuing precisely this approach in early stages of drafting the 12-month finding.  See SAR 179-80 (FWS briefing paper); SAR 203-21 (FWS outline of proposed rule to list); SAR 336 (FWS briefing paper).

27

In the 2007 12-month finding, FWS acknowledged that Arctic grayling in Montana are discrete from and exhibit significantly different genetic characteristics than populations in Canada and Alaska.  <u>See</u> 72 Fed. Reg. at 20,311-12.  In light of these findings, FWS's failure to analyze whether the larger population met the criteria for listing as endangered or threatened under the ESA was arbitrary and capricious.  <u>See</u> 16 U.S.C. § 1533(a)(1); <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 43; <u>Pac. Coast Fed'n Of Fishermen's Ass'ns</u>, 265 F.3d at 1034 (agency must "articulate[] a rational connection between the facts found and the choices made") (quotation and citation omitted).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their motion for summary judgment be granted and that the challenged decision be remanded to FWS.

Respectfully submitted this 20th day of April, 2009,

<u>  /s/ Jenny K. Harbine     </u>
Douglas Honnold
Timothy J. Preso
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695
dhonnold@earthjustice.org
tpreso@earthjustice.org
jharbine@earthjustice.org

Michael Senatore
Center for Biological Diversity
1601 Connecticut Ave., N.W., Suite 701
Washington, D.C.  20009
(301) 466-0774
Fax:  (202) 588-5209
msenatore@biologicaldiversity.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2), I hereby certify that the foregoing brief

contains 6,431 words, in compliance with the Court's 6,500 word limit.

Dated:  April 20, 2009                  /s/ Jenny K. Harbine
                                        Jenny K. Harbine